## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| (1) | CRAIG PC SALES & SERVICE, LLC, an Oklahoma limited liability company; | ) ) ) |
| (2) | RAY T. CRAIG, SR., an individual; and | ) ) |
| (3) | RAY T. CRAIG, II, an individual, | ) Case No. CIV-17-3-F |
| | Plaintiffs, | ) ) **JURY TRIAL DEMANDED** ) **ATTORNEYS' LIEN CLAIMED** |
| v. | | ) ) |
| (1) | CDW GOVERNMENT, LLC, an Illinois limited liability company; and | ) ) ) |
| (2) | MICROSOFT CORPORATION, a Washington corporation, | ) ) ) |
| | Defendants. | ) |

## FIRST AMENDED COMPLAINT

Plaintiffs Craig PC Sales & Service, LLC ("Craig PC"), an Oklahoma limited liability company, Ray T. Craig, Sr. ("Craig, Sr."), an individual, and Ray T. Craig, II ("Craig, II"), for their causes of action against Defendants CDW Government, LLC ("CDWG"), an Illinois limited liability company, and Microsoft Corporation ("Microsoft"), a Washington corporation, do allege and state as follows:

### The Parties

1. At all relevant times herein mentioned, Plaintiff Craig PC was and now is a domestic for-profit business entity whose principal place of business is in Grady County,

State of Oklahoma. Plaintiff Craig PC's only members are Craig, Sr. and Craig, II, who are both citizens of the State of Oklahoma as hereinafter alleged.

2.      At all relevant times herein mentioned, Plaintiff Craig, Sr. was and now is a resident of the Western District of Oklahoma and a citizen of the State of Oklahoma.

3.      At all relevant times herein mentioned, Plaintiff Craig, II was and now is a resident of the Western District of Oklahoma and a citizen of the State of Oklahoma.

4.      At all relevant times herein mentioned, Defendant CDWG was and now is a for-profit business entity whose principal place of business is in Vernon Hills, Illinois. Upon information and belief, CDWG's sole member is CDW LLC. Upon further information and belief, CDW LLC's sole member is CDW Corporation, a Delaware corporation with its principal place of business located in Vernon Hills, Illinois.

5.      At all relevant times herein mentioned, Defendant Microsoft was and now is a for-profit business entity incorporated in the State of Washington and whose principal place of business is in Redmond, Washington.

<u>Jurisdiction and Venue</u>

6.      This Court has subject matter jurisdiction over the claims asserted herein pursuant to 28 U.S.C. §§ 1331 and 1332 in that Plaintiffs have alleged certain claims arising under federal law, and in that there is complete diversity of citizenship between all Plaintiffs and Defendants and the amount in controversy is in excess of $75,000.00.

7.      Venue is proper in this judicial district because all or a part of Plaintiffs' causes of action arose here.

Factual Allegations

8.      Plaintiffs Craig, Sr. and Craig, II are father and son. On or around May 21,

1993, Craig, Sr. and Craig, II formed Craig PC Sales & Service, Inc. On January 21,

2011, Craig, Sr. and Craig, II converted their business into a limited liability company.

Craig PC has operated continuously since its formation in 1993.

9.      At all relevant times herein mentioned, Plaintiff Craig PC was and now is a

family owned and operated computer business that provides, among other things,

computer sales, maintenance, and service to public and private clients in and around the

State of Oklahoma.

10.      At all relevant times herein mentioned, Defendant Microsoft has developed,

advertised, marketed, distributed, and licensed a number of computer software programs,

including the Microsoft Windows operating system ("Windows") and the Microsoft

Office Suite ("Office").

11.      Defendant Microsoft sells licenses for the use of its various software

programs, including Windows and Office, rather than selling the software outright. Every

installation of Microsoft Windows, for example, is covered by one or more license

agreements, with terms that vary depending on the distribution channel and the software

edition.

12.      From 2003 through 2012, Microsoft published information to the public on

its website stating that it does not sell licenses directly to customers, but instead sells its

licenses through its business partners, known as Microsoft Partners. According to

information that Microsoft published to the public on its website, Microsoft trains and

relies on its partners to provide advice and support to customers about obtaining the right license and products for their individual needs.

13.     At all relevant times herein mentioned, Defendant CDWG and its parent companies, CDW LLC and CDW Corporation, have been members of Microsoft's Partner Network or Partner Program.

14.     CDW Corporation is a publicly traded corporation that was founded in 1984. It is a Fortune 500 company that, for the year ended December 31, 2016, generated net sales of nearly $14 billion. CDW Corporation is the sole member of CDW LLC.

15.     CDW LLC is the sole member of Defendant CDWG. Defendant CDWG generates revenue for its sole member by selling, among other things, Microsoft software primarily to educational and healthcare institutions. Defendant CDWG's revenues and expenses are reflected dollar-for-dollar on CDW LLC's consolidated financial statements.

16.     Defendant CDWG has represented in court filings that CDW LLC, through its related entities (including Defendant CDWG), spends millions of dollars each year developing its customer relationships. According to court filings, Defendant CDWG and the other CDW entities together invest substantial sums of money each year to acquire detailed knowledge of clients' business and technological needs. Further, according to court filings, Defendant CDWG and the other CDW entities take great care to retain and protect information related to their clients' unique technological requirements.

17.     Defendant CDWG has published information to the public through its website boasting of its expertise in software licensing and reassuring its customers that its employees are trained to help them purchase the correct Microsoft products and licenses.

18.     Defendant CDWG has published information to the public available through its website stating that a partnership with Defendant CDWG means that customers "can finally be free of the burdensome, time-consuming complexities of managing software selection, customization, licensing, upgrades and ongoing maintenance. Our software experts and tools enable you to stay up to date on your software inventory, migrations and compliance requirements."

19.     Defendant CDWG has published information to the public available through its website stating that its "dedicated account teams" can "take the guesswork out of software licensing and purchasing, and help guide you through which software licensing programs and products best fit your business requirements."

20.     Defendant CDWG has published information to the public available through its website that notes software licensing can be very complex. According to representations that are available through Defendant CDWG's website, customers can "rely" on "specially-trained" software licensing specialists to "expertly assist you in determining the right licensing program to fit your needs."

21.     In or around 2006, Defendant CDWG hired a commissioned sales representative by the name of Tyler Hardy. Hardy had a physical office in Chicago, Illinois, but his assigned sales territory included the State of Oklahoma. Upon

information and belief, Hardy was employed by Defendant CDWG from 2006 through October 2010.

22.     For the first six months of his employment with Defendant CDWG, Hardy received ongoing sales training, including training about CDWG's sales pitches, the attributes of different products, and Microsoft licensing agreements, including information about licenses specifically available for educational institutions and how to qualify for educational licenses. This training was provided primarily by Defendant Microsoft itself.

23.     Upon information and belief, Hardy, as a part of his ongoing training and employment at Defendant CDWG, had access to CDWG's current and prospective customer lists and information; partner information and pricing; pricing and margins strategies; shipping strategies; sales methods, strategies, and strategic partnerships; cost, pricing, and estimating information; the integration and aggregation of customer and prospective client information; and, among other information, customer technological solution strategies.

24.     During the entire time of Hardy's employment with Defendant CDWG, Microsoft employees ensured that CDWG sold the correct product, including the correct software licensing, to its customers. During the entire time of Hardy's employment with Defendant CDWG, as a part of every order fulfillment, a Microsoft employee would approve the purchase and issue the license.

25.     Shortly after he began performing his sales duties for Defendant CDWG, Hardy began cold calling school districts in western Oklahoma that were customers of

6

Plaintiff Craig PC. As a part of his sales pitch, Hardy offered the schools Microsoft software at a discounted academic rate. Hardy's sales pitch was based on the training and information provided by Defendant CDWG and Defendant Microsoft.

26.    Prior to the time that Hardy began cold calling its customers, Plaintiff Craig PC did not build computers, but instead purchased computers and resold them to its school district customers. As a part of its ordinary sale process, Plaintiff Craig PC purchased computers with Microsoft Windows preinstalled. In other words, Plaintiff Craig PC did not have any involvement in purchasing Microsoft Windows licenses or installing Microsoft Windows prior to 2006, except on very limited occasions.

27.    Prior to the time that Hardy began cold calling its customers, Plaintiff Craig PC purchased computers that had an Original Equipment Manufacturer ("OEM") license, which included a Certificate of Authenticity label that was affixed to each computer. The OEM licenses sold at the same price without regard to the customer, i.e. there was not any academic discount affiliated with OEM licenses.

28.    After Hardy began cold calling its customers and offering to sell Microsoft Windows at reduced, academic discount pricing, Plaintiff Craig PC spoke to Hardy to determine the propriety of the academic discount pricing.

29.    Hardy, in the performance of his job duties and responsibilities for Defendant CDWG, told Plaintiff Craig PC, through its various agents and employees, including Craig, II, that Plaintiff Craig PC could purchase Microsoft Windows licenses through the Volume Licensing channel for Craig PC's educational clients.

30.     Hardy, in the performance of his job duties and responsibilities for Defendant CDWG, further told Plaintiff Craig PC, through its various agents and employees, including Craig, II, that Plaintiff Craig PC could install Microsoft Windows Volume Licenses on "naked" computers, i.e. computers that did not have any preinstalled Microsoft Windows operating system, for its educational clients.

31.     In reliance on Defendant CDWG's purported expertise as explained on its website and in other oral representations, including its relationship as a Microsoft Partner, Plaintiff Craig PC began purchasing Microsoft Windows Volume Licenses for its school district clients and installing that product on new computers sold to the school districts.

32.     Defendant CDWG's representations about the use of Volume Licenses on "naked" computers designed for school districts, which Plaintiff Craig PC followed, was consistent with technical support provided by Defendant Microsoft to Plaintiff Craig PC and to various school districts around the State of Oklahoma.

33.     Defendant CDWG, through various employees, and Defendant Microsoft, through various employees, explained to Plaintiff Craig PC that it was appropriate to use the same Product Key on multiple computers, for different school districts, so long as Craig PC purchased a volume license for each separate computer.

34.     Defendant CDWG, through various employees, and Defendant Microsoft, through various employees, explained to Plaintiff Craig PC that it was appropriate to use Volume Licenses on "naked" computers designed for school districts even though the purchase of a Volume License did not include a Certificate of Authenticity label to affix to each computer.

35.     Defendant CDWG, through various employees, and Defendant Microsoft, through various employees, explained to Plaintiff Craig PC that it was appropriate to "clone," or "image," one computer and use it to install all software on another computer, with the purchase of a Volume License for each separate computer.

36.     From and after 2006, Plaintiff Craig PC relied on these representations in purchasing computers and software licenses for its school district customers.

37.     On or around June 30, 2006, Microsoft claims that it received a complaint from Jason Hefley regarding Plaintiff Craig PC. Microsoft created an "Infringement Report" stating that Plaintiff Craig PC may be engaged in a process called "hard disk loading."

38.     However, Jason Hefley never contacted Microsoft or made any complaint about Plaintiff Craig PC whatsoever.

39.     On May 29, 2007, Microsoft caused a "test purchase" to be made at Plaintiff Craig PC's office. Plaintiff Craig PC passed the "test purchase," in that it sold genuine Microsoft products with the proper licensing.

40.     On or around May 20, 2009, Microsoft claims that it received a complaint from M. Warren about "highly suspicious activity" of Plaintiff Craig PC. Microsoft assigned Miles Hawkes, Senior Program Manager of Investigations for Defendant Microsoft, to investigate the allegation.

41.     On or around May 21, 2009, Hawkes, in the performance of his job duties and responsibilities for Defendant Microsoft, had a telephone conversation with an

individual named Derrick Thornton. Thornton owned and operated a company named Industry Systems, a competitor of Craig PC in southwestern Oklahoma.

42.     According to Hawkes, Thornton told him that no one could beat Plaintiff Craig PC's bids to school districts for computer sales and service, with the implication being that Plaintiff Craig PC could underbid because it was engaged in copyright violations.

43.     Thornton did not tell Hawkes that nobody could beat Craig PC's bids. Instead, Thornton told Hawkes that there was one occasion when his company, Industry Systems, could not beat Craig PC's bid.

44.     On or around June 16, 2009, Hawkes and Monty Montgomery, another Microsoft investigator, traveled to Oklahoma to interview Thornton and two of his employees, Jeff Goodman and James Coker. Goodman and Coker were both former employees of Plaintiff Craig PC. Goodman worked as a field technician with Craig PC from approximately 1997 to 1998. Coker worked as a field technician with Craig PC from approximately 2000 to 2004.

45.     Hawkes created written notes of his interviews with Goodman, Coker, and Thornton. According to Hawkes, Goodman and Coker both accused Craig PC of engaging in a practice known as "hard disk loading."

46.     According to Defendant Microsoft, hard disk loading is the installation of software for which a company has no license onto a computer's hard disk before it is sold to a customer. This allows a computer reseller to save money, because they can install the same program at no additional cost on multiple computers.

47.     According to Hawkes, Coker told him that, when Coker worked at Craig PC, the company sold around 100 computers per month, and 99% of them were hard disk loaded.

48.     Goodman and Coker actually said that Craig PC used a hard disk to load the computers with software, in other words the software was loaded with a CD. This is standard practice and does not violate any term of Microsoft's licensing agreements. Goodman and Coker did not state that Craig PC engaged in "hard disk loading" as Microsoft used that term.

49.     On June 17, 2009, Hawkes and Monty Montgomery visited Friend School District and Hinton School District while they were in Oklahoma. Both of these school districts allowed Microsoft investigators Hawkes and Montgomery to test some of their computers that were purportedly purchased by Plaintiff Craig PC.

50.     According to Microsoft investigators, the computers tested showed "massive hard disk loading" and many did not have a Certificate of Authenticity label attached to them.

51.     Contrary to Microsoft's representations, Plaintiff Craig PC had purchased all the software licenses in compliance with instructions from Defendant CDWG and in a way that was consistent with explanations later provided to Plaintiff Craig PC and others by Defendant Microsoft's technical support representatives.

52.     In or around July 2009, Defendant Microsoft contacted the Oklahoma City Division of the Federal Bureau of Investigation ("FBI") and made allegations that

Plaintiff Craig PC systematically sold to Oklahoma schools pirated versions of Microsoft's Windows operating system software.

53.     The FBI assigned the investigation of Defendant Microsoft's allegations to the Norman Field Office, rather than its Cybercrime Unit, because Plaintiff Craig PC operated in the geographical area covered by the Norman Field Office.

54.     Once the investigation was assigned to the Norman Field Office, Special Agent Deborah Decker ("SA Decker") was tasked with conducting the investigation.

55.     At the time of her assignment, SA Decker had never worked a copyright case before, nor did she have any specific training in the area of cybercrime.

56.     At the time of her assignment, SA Decker had also never had any training in regards to Defendant Microsoft's licensing requirements. As a result of her inexperience and complete lack of knowledge in this area, SA Decker relied completely on the purported expertise of Defendant Microsoft's employees and agents in determining whether Plaintiffs engaged in any copyright violations because she had no independent basis of knowledge to know whether Plaintiffs' conduct ever violated any of Defendant Microsoft's copyrights.

57.     On or around February 8, 2010, SA Decker spoke telephonically with Hawkes.

58.     Upon information and belief, Hawkes explained hard disk loading to SA Decker and represented that Plaintiff Craig PC was violating Microsoft's copyright by engaging in hard disk loading, even though Goodman and Coker simply explained that hard disk loading, to them, meant the use of a CD to install software.

59.     Upon information and belief, Hawkes explained Certificates of Authenticity to SA Decker and represented that Plaintiff Craig PC was violating Microsoft's copyright because the computers it sold to school districts did not have Certificate of Authenticity labels affixed thereto, even though Plaintiff Craig PC's actions were consistent with support and instruction from Defendant CDWG and Defendant Microsoft.

60.     Upon information and belief, Hawkes explained Volume Licensing to SA Decker and represented that Plaintiff Craig PC was violating Microsoft's copyright by purchasing volume licenses for school district computers without an underlying Original Equipment Manufacturer base license, even though Plaintiff Craig PC's actions were consistent with support and instruction from Defendant CDWG and Defendant Microsoft.

61.     Hawkes' statements to SA Decker that Plaintiff Craig PC violated Microsoft's copyright were false and/or made in reckless disregard for the truth.

62.     Following Hawkes and SA Decker's phone conversation on February 8, Hawkes sent an e-mail to SA Decker on February 9, 2010. The e-mail contained Hawkes' written notes of his interviews of Goodman, Coker, and Thornton.

63.     SA Decker did not ever personally interview Goodman or Coker, but instead relied entirely on Defendant Microsoft's representations about the substance of the interviews.

64.     In addition to the information that Hawkes provided about Goodman, Coker, and Thornton, Hawkes also provided SA Decker information about the alleged

report of hard disk loading by Jason Hefley. As alleged hereinabove, Hefley never made any such report to Microsoft.

65.   SA Decker did not ever personally interview Hefley, but instead relied entirely on Defendant Microsoft's representations about the substance of the interview.

66.   From February 9, 2010 through January, 2011, SA Decker conducted an investigation into Plaintiff Craig PC based on suspected violations of multiple criminal statutes, including criminal prohibitions against copyright infringement.

67.   Throughout SA Decker's investigation, she maintained contact with Defendant Microsoft's investigators and, upon information and belief, continued to contact them telephonically and via e-mail to report her findings and obtain additional information in response to her questions about Microsoft's licensing requirements. Defendant Microsoft conducted all of the tests related to the computers at issue, and SA Decker relied on Microsoft's interpretation of the test data.

68.   On January 21, 2011, Microsoft investigator Monty Montgomery represented to SA Decker that Craig PC had only purchased 39 units of Microsoft software from July 1, 2008 through June 30, 2012.

69.   Montgomery's statement was false and/or made with reckless disregard for the truth, because Craig PC had purchased hundreds of units of Microsoft software in that time frame.

70.   On January 24, 2011, SA Decker interviewed several school districts that were clients of Plaintiff Craig PC. Microsoft investigators were present during the interviews and the investigators conducted tests of certain computers. Microsoft

investigators related to SA Decker that the results of the tests showed that Plaintiff Craig

PC was violating Microsoft's copyright in multiple ways.

71.    However, the results of the test showed that, to the contrary, Plaintiff Craig

PC had purchased software licenses in compliance with the instructions it received from

Defendant CDWG and in a way consistent with later explanations provided by

Microsoft's technical support staff.

72.    On January 25, 2011, upon information and belief, SA Decker presented an

Affidavit of Probable Cause to the Honorable Gary M. Purcell, Magistrate Judge for the

United States District Court for the Western District of Oklahoma and, in the Affidavit,

made the following material statements that were false and/or made in reckless disregard

for the truth, all based on representations by Microsoft investigators with whom she was

working in a concerted joint effort:

1.    That Plaintiff Craig PC, Craig, Sr., and Craig, II had purchased only 39 Microsoft licenses, in total, from July 1, 2008 through June 30, 2012;

2.    That Derrick Thornton claimed his company, Industry Systems, could not compete with Craig PC's low-priced bids if Industry Systems' computers were being properly loaded with new, licensed Microsoft operating systems;

3.    That Jeff Goodman and James Coker stated Plaintiff Craig PC engaged in extensive hard disk loading;

4.    That Plaintiffs Craig PC, Craig, Sr., and Craig, II violated Microsoft's copyright by using the same product key on multiple computers for multiple clients;

5.    That Plaintiffs Craig PC, Craig, Sr., and Craig, II violated Microsoft's copyright by not affixing Certificates of Authenticity to computers that it sold;

6.    That Plaintiffs Craig PC, Craig, Sr., and Craig, II violated Microsoft's copyright by using Volume Licenses on "naked" computers sold to clients;

7.    That Plaintiffs Craig PC, Craig, Sr., and Craig, II violated Microsoft's copyright by removing the Certificate of Authenticity from certain computers; and

8.    That Plaintiffs Craig PC, Craig, Sr., and Craig, II violated Microsoft's copyright had used a "key generator" for certain Microsoft Office programs.

73.    All of Plaintiff Craig PC, Craig, Sr., and Craig, II's actions were in compliance with instructions provided by Defendant CDWG, necessarily with approval from Microsoft, and were consistent with later explanations provided by Microsoft's technical support staff.

74.    Based on the false information provided by Microsoft and SA Decker, Magistrate Judge Purcell signed search and seizure warrants relating to Craig PC's business operations and assets.

75.    Based on the false information provided by Microsoft and SA Decker, Magistrate Judge Purcell signed seizure warrants for Craig, Sr. and Craig, Jr.'s personal assets that were purportedly the fruits of their criminal activities, although they engaged in no such criminal activities.

76.    On January 27, 2011, the FBI and United States Marshals Service executed the seizure warrants and seized Craig, Sr. and Craig, II's property that was purportedly the fruits of their criminal activities, although they engaged in no such criminal activities.

77.     On January 27, 2011, the FBI, along with Microsoft investigators Randy Bradley and Monty Montgomery, executed the search and seizure warrants of Craig PC's offices and conducted interviews of various Craig PC employees.

78.     The FBI and US Marshals Service seized assets from Craig PC, Craig, Sr., and Craig, II with a total approximate value of $3.5 million.

79.      In February 2011, Plaintiffs filed a civil suit seeking the return of their assets. The Honorable Vicki Miles-LaGrange dismissed the suit because Plaintiffs failed to exhaust their administrative remedies prior to commencing the action.

80.     On June 22, 2011, the United States of America filed a civil forfeiture action against all of the property seized from Craig PC, Craig, Sr., and Craig II. The complaint and supporting affidavit, which was, upon information and belief, executed by SA Decker, were sealed. See United States of America v. One 2011 Chevrolet Equinox et al., Western District of Oklahoma Case No. CIV-11-710-M.

81.     From June 22, 2011 through December 2012, the United States failed and refused to serve process on Plaintiffs Craig PC, Craig, Sr., or Craig, II in relation to the civil forfeiture action. During the entire pendency of June 22, 2011 through December 14, 2012, the civil forfeiture action remained sealed and Plaintiffs did not have notice of the allegations against them. Plaintiffs filed another civil action against the United States on October 16, 2012, and shortly thereafter on December 14, 2012, Plaintiffs were finally served with process in the civil forfeiture action. See Ray T. Craig, II et al. v. United States of America, Western District of Oklahoma Case No. CIV-12-1134-M. Upon service of the civil forfeiture action, Case No. CIV-12-1134-M was dismissed.

82.     From June 22, 2011 through December 14, 2012, and thereafter, SA Decker continued to work in concert and as a team with Microsoft and its investigators. Microsoft provided periodic reports to SA Decker purporting to represent evidence of Craig PC's violations of Microsoft copyrights, but again all the tests showed that Craig PC acted in reliance on instructions from Defendant CDWG in a way that was consistent with later explanations provided by Microsoft's technical support staff.

83.     In 2011 and 2012, SA Decker continued to engage in interviews of relevant witnesses along with Microsoft investigators Randy Bradley and Monty Montgomery, who were present during the interviews. During the course of their joint, concerted investigation, SA Decker and Microsoft learned that CDWG had provided instructions to others besides Plaintiffs to engage in the same type of licensing purchasing that Microsoft stated was in violation of its copyright.

84.     SA Decker and Microsoft investigators looked the other way and failed to take this information into account during their investigation, because it was wholly contradictory to their joint and concerted effort to harm Plaintiffs and deprive them of their constitutional rights and lawful business activities.

85.     On or around December 12, 2012, two days before SA Decker signed an Amended Affidavit of Probable Cause that was attached to the Amended and Verified Complaint in the civil forfeiture action, SA Decker sent an email to Microsoft investigator Randy Bradley with a subject line reading "Help!!"

86.     In the email, SA Decker was seeking last minute help from Microsoft about basic concepts regarding Microsoft licensing and Craig PC's purchases, again indicating

her complete reliance on Microsoft in forming opinions about the propriety of Craig PC's actions in this case.

87.     Defendant Microsoft's continued representations to SA Decker caused the continuation of the investigation into Plaintiffs' business activities.

88.     In or around November and December of 2012, the United States presented testimony to a grand jury in an effort to seek an indictment against Craig PC, Craig, Sr., and Craig, II.

89.     Upon information and belief, the case was presented to multiple grand juries, but the United States never obtained an indictment. At some point in time between December 2012 and May 2015, the United States Attorneys Office for the Western District of Oklahoma declined criminal charges against Plaintiffs.

90.     In 2014, the United States and Plaintiffs Craig PC, Craig, Sr., and Craig, II entered into a settlement agreement of the civil forfeiture claim, wherein Plaintiffs refused to admit any wrongdoing but did agree to pay a sum of money to resolve the allegations.

91.     Unbeknownst to the Plaintiffs, prior to the execution of the settlement agreement, upon information and belief, SA Decker and Microsoft's investigators had presented these same claims of criminal copyright infringement to the Oklahoma Attorney General.

92.     On November 5, 2014, the State of Oklahoma filed criminal felony charges against Craig, Sr., Craig, II and non-party Jay Jerdee. In support of the charges, the State

obtained an Affidavit of Probable Cause from SA Decker. SA Decker provided the same false information identified in paragraph 72, above.

93.     On June 3, July 1, and September 17, 2015, the State presented its evidence at a preliminary hearing. At the preliminary hearing, Microsoft investigator Randy Bradly and purported licensing expert and Microsoft employee Enoch Remick provided testimony that Craig PC, Craig, Sr., and Craig II had violated Microsoft's copyright in the same manner as described above.

94.     The testimony, which had also been provided to SA Decker and led to the state criminal charges, was false and/or made in reckless disregard for the truth. Craig PC's conduct in purchasing Microsoft software was in compliance with instructions from Defendant CDWG and in a way that was consistent with explanations later provided to Plaintiff Craig PC and others by Defendant Microsoft's technical support representatives.

95.     As a result of the false testimony provided by Defendant Microsoft's employees, the District Court of Grady County bound Craig, Sr., Craig, II, and Jay Jerdee over for trial upon a finding of probable cause.

96.     In the absence of the false and or reckless testimony by Microsoft employees and SA Decker, there was insufficient evidence to support a finding of probable cause.

97.     On September 13, 2016, the State moved to dismiss all charges against Craig, Sr., Craig, II, and Jerdee and agreed in writing not to refile the charges.

98.     Craig, Sr. pled no contest to a different charge, a criminal misdemeanor.

99.     Craig, II did not plead guilty or no contest to any criminal charges.

100.    On November 7, 2015, the District Court of Grady County entered an Order of Expungement in favor of Craig, II, expunging his records of the criminal charges filed against him.

101.    Defendant Microsoft and Defendant CDWG had the ability to end the criminal investigations, civil forfeiture action, and state criminal charges against Craig PC, Craig, Sr., and Craig, II at any point in time.

102.     Defendant Microsoft made false allegations, or made allegations in reckless disregard of the truth, that Craig PC, Craig, Sr., and Craig, II violated its copyright when it knew Plaintiffs did not violate its copyright. If Defendant Microsoft would have revealed the truth, the investigation, civil forfeiture, and criminal charges would have terminated and ceased.

103.    Defendant CDWG made false statements during the course of the investigation, i.e. that it sold Volume Licenses to Craig PC with the understanding that Craig PC was purchasing the Volume Licenses for computers that already had a Microsoft OEM License installed. Contrary to these statements, Defendant CDWG knew or should have known that it was selling Volume Licenses to Craig PC for "naked" computers.

104.    At no time did Plaintiff Craig PC knowingly violate any of Microsoft's copyrights, but instead acted in accordance with instructions provided by Defendant CDWG and consistently with explanations provided by Microsoft itself.

## PLAINTIFFS' FIRST CAUSE OF ACTION – NEGLIGENCE AGAINST DEFENDANT CDWG

105.    Plaintiffs incorporate by reference paragraphs 1-104 as though set forth in full herein.

106.    Pursuant to 76 O.S. § 1, "Every person is bound, without contract, to abstain from injuring the person or property of another, or infringing upon any of his rights."

107.    Oklahoma courts have recognized that the existence of a duty depends upon the relationship between the parties and the general risks involved in the common undertaking. <u>Union Bank of Tucson v. Griffin</u>, 1989 OK 47, 771 P.2d 219.

108.    Whenever a person is placed in such a position with regard to another that it is obvious that if he did not use due care in his conduct he will cause injury to the other, the duty at once arises to exercise care commensurate with the situation in order to avoid such injury. <u>Id.</u> at 222.

109.    Here, Plaintiffs and Defendant CDWG had a business relationship wherein CDWG knew that the Plaintiffs relied on Defendant CDWG's advice and recommendations on the proper software licenses to purchase for Plaintiffs' clients.

110.    It was foreseeable to Defendant CDWG that Plaintiffs relied on its advice because Plaintiffs inquired about the propriety of the licenses they were purchasing and because Defendant CDWG, in accordance with its published materials, seeks to foster a relationship wherein CDWG provides expert advice on software licensing.

111.    Defendant CDWG breached its duty of care to Plaintiffs when it instructed Plaintiff to purchase Volume Licenses for "naked" computers because Defendant CDWG

knew, or should have known, that Microsoft sometimes takes the position that this violates its licensing agreement.

112.    Defendant CDWG breached its duty of care to Plaintiffs when it instructed Plaintiff that it was appropriate to use the same Product Key on multiple computers, for different school districts, so long as Craig PC purchased a volume license for each separate computer because Defendant CDWG knew, or should have known, that Microsoft sometimes takes the position that this violates its licensing agreement.

113.    Defendant CDWG breached its duty of care to Plaintiffs when it instructed Plaintiff that it was appropriate to "clone," or "image," one computer and use it to install all software on another computer, with the purchase of a Volume License for each separate computer because Defendant CDWG knew, or should have known, that Microsoft sometimes takes the position that this violates its licensing agreement.

114.    As a direct and proximate result of Defendant CDWG's negligence, Plaintiffs suffered economic and non-economic damages in excess of $75,000.00.

115.    Defendant CDWG acted intentionally, maliciously, or in reckless disregard for Plaintiffs' rights, all in a money-making scheme, and Plaintiffs are entitled to punitive and exemplary damages.

116.    Plaintiffs did not have any notice of Defendant CDWG's breaches of duty until, at the very earliest, January 27, 2011, and Plaintiffs originally commenced this suit in a timely fashion on January 23, 2013. Plaintiffs then re-filed the suit on January 14, 2014, within one year of dismissal without prejudice, and are therefore timely based upon the Oklahoma savings statute.

WHEREFORE, Plaintiffs Craig PC Sales & Service, LLC, Ray T. Craig, Sr., and Ray T. Craig, II, pray for judgment against Defendant CDW Government, LLC as follows:

(1)     For economic and noneconomic damages in excess of Seventy-Five Thousand Dollars and No/100 ($75,000.00);

(2)     For punitive and exemplary damages;

(3)     For interest thereon as provided by law, both pre-judgment and post-judgment;

(4)     For their costs and a reasonable attorneys' fee; and

(5)     For such other and further relief as the Court deems just, equitable, and proper.

## PLAINTIFFS' SECOND CAUSE OF ACTION AGAINST CDWG – NEGLIGENT MISREPRESENTATION

117.     Plaintiffs incorporate by reference paragraphs 1-116 as though set forth in full herein.

118.     Defendant CDWG, in the course of its business, profession, and employment, supplied false information to Plaintiffs Craig PC, Craig, Sr., and Craig, II as hereinabove described.

119.     Defendant CDWG supplied false information in that it represented and instructed Craig PC, Craig, Sr., and Craig, II that it was appropriate to purchase Volume Licenses for "naked" computers designed for school districts; that it was appropriate to use the same Product Key on multiple computers, for different school districts, so long as

Craig PC purchased a volume license for each separate computer; and that it was appropriate to "clone," or "image," one computer and use it to install all software on another computer, with the purchase of a Volume License for each separate computer, because Defendant CDWG knew, or should have known, that Microsoft sometimes takes the position that this violates its licensing agreement.

120.   Defendant CDWG failed to exercise reasonable care or competence in obtaining or communicating this information to Plaintiffs.

121.   Plaintiffs Craig PC, Craig, Sr., and Craig, II justifiably relied on Defendant CDWG for business advice and guidance, in that Defendant CDWG holds itself out as an expert in the field as described herein.

122.   As a direct and proximate result of Defendant CDWG's negligence, Plaintiffs suffered economic and non-economic damages in excess of $75,000.00.

123.   Defendant CDWG acted intentionally, maliciously, or in reckless disregard for Plaintiffs' rights, all in a money-making scheme, and Plaintiffs are entitled to punitive and exemplary damages.

124.   Plaintiffs did not have any notice of Defendant CDWG's breaches of duty until, at the very earliest, January 27, 2011, and Plaintiffs originally commenced this suit in a timely fashion on January 23, 2013. Plaintiffs then re-filed the suit on January 14, 2014, within one year of dismissal without prejudice, and are therefore timely based upon the Oklahoma savings statute.

WHEREFORE, Plaintiffs Craig PC Sales & Service, LLC, Ray T. Craig, Sr., and Ray T. Craig, II, pray for judgment against Defendant CDW Government, LLC as follows:

(1)     For economic and noneconomic damages in excess of Seventy-Five Thousand Dollars and No/100 ($75,000.00);

(2)     For punitive and exemplary damages;

(3)     For interest thereon as provided by law, both pre-judgment and post-judgment;

(4)     For their costs and a reasonable attorneys' fee; and

(5)     For such other and further relief as the Court deems just, equitable, and proper.

**PLAINTIFFS' THIRD CAUSE OF ACTION AGAINST CDWG – INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS AND/OR PROSPECTIVE ECONOMIC ADVANTAGE**

125.    Plaintiffs incorporate by reference paragraphs 1-124 as though set forth in full herein.

126.    Plaintiffs had a valid business relationship and expectancy with various school districts and private clients.

127.    Defendant CDWG had knowledge of Plaintiffs' valid business relationship and expectancy with these school districts and private clients.

128.    Defendant CDWG intentionally interfered with Plaintiffs' valid business relationship and expectancy by knowingly selling Plaintiffs software that, according to

Microsoft, violated Microsoft's copyright. Defendant CDWG's intentional and malicious interference caused Plaintiffs to lose their business relations and contracts with clients.

129. Defendant CDWG acted intentionally, willfully, and maliciously, and its interference was not justified or privileged.

130. As a direct and proximate result of Defendant CDWG's intentional interference, Plaintiffs suffered economic and non-economic damages in excess of $75,000.00.

131. Defendant CDWG acted intentionally, maliciously, or in reckless disregard for Plaintiffs' rights, all in a money-making scheme, and Plaintiffs are entitled to punitive and exemplary damages.

WHEREFORE, Plaintiffs Craig PC Sales & Service, LLC, Ray T. Craig, Sr., and Ray T. Craig, II, pray for judgment against Defendant CDW Government, LLC as follows:

(1) For economic and noneconomic damages in excess of Seventy-Five Thousand Dollars and No/100 ($75,000.00);

(2) For punitive and exemplary damages;

(3) For interest thereon as provided by law, both pre-judgment and post-judgment;

(4) For their costs and a reasonable attorneys' fee; and

(5) For such other and further relief as the Court deems just, equitable, and proper.

**PLAINTIFFS CRAIG PC AND CRAIG, II'S FOURTH CAUSE OF ACTION AGAINST DEFENDANT MICROSOFT – FOR MALICIOUS PROSECUTION IN VIOLATION OF OKLAHOMA LAW**

132.   Plaintiffs incorporate by reference herein paragraphs 1-131 as though set forth in full herein.

133.   Defendant Microsoft caused a federal criminal investigation and state criminal action to be brought against Plaintiffs Craig PC and Craig, II.

134.   The federal criminal investigation and state criminal action terminated in favor of Plaintiffs Craig PC and Craig, II because the federal investigation never resulted in criminal charges and because the state criminal action was dismissed with the State agreeing in writing not to re-file.

135.   There was a want of probable cause in Microsoft's actions causing both the federal criminal investigation and the state law criminal action and, to the extent any court found probable cause, it was based upon false statements and material omissions that vitiated probable cause if exposed.

136.   Defendant Microsoft acted at all times intentionally and maliciously.

137.   Defendant Microsoft is equitably estopped from asserting the statute of limitations as a defense with regard to the federal criminal investigation because it made material false representations that Plaintiffs relied upon, in that Microsoft alleged and stated that Plaintiffs' actions violated its copyright.

138.   As a direct and proximate result of Defendant Microsoft's malicious prosecution, Plaintiffs suffered economic and non-economic damages in excess of $75,000.00.

139.   Defendant Microsoft acted intentionally, maliciously, or in reckless disregard for Plaintiffs' Craig PC and Craig, II's rights, all in a money-making scheme, and Plaintiffs are entitled to punitive and exemplary damages.

WHEREFORE, Plaintiffs Craig PC Sales & Service, LLC and Ray T. Craig, II, pray for judgment against Defendant Microsoft Corporation as follows:

(1)   For economic and noneconomic damages in excess of Seventy-Five Thousand Dollars and No/100 ($75,000.00);

(2)   For punitive and exemplary damages;

(3)   For interest thereon as provided by law, both pre-judgment and post-judgment;

(4)   For their costs and a reasonable attorneys' fee; and

(5)   For such other and further relief as the Court deems just, equitable, and proper.

## PLAINTIFFS CRAIG PC AND CRAIG, II'S FIFTH CAUSE OF ACTION AGAINST DEFENDANT MICROSOFT – FOR MALICIOUS PROSECUTION IN VIOLATION OF THE UNITED STATES CONSTITUTION

140.   Plaintiffs incorporate by reference herein paragraphs 1-139 as though set forth in full herein.

141.   Plaintiffs Craig PC and Craig, II had a Fourth and Fourteenth Amendment constitutional right to remain free from false arrest and unlawful prosecution.

142.   Defendant Microsoft caused a federal criminal investigation and state criminal action to be brought against Plaintiffs Craig PC and Craig, II.

143. The federal criminal investigation and state criminal action terminated in favor of Plaintiffs Craig PC and Craig, II because the federal investigation never resulted in criminal charges and because the state criminal action was dismissed with the State agreeing in writing not to re-file.

144. There was a want of probable cause in Microsoft's actions causing both the federal criminal investigation and the state law criminal action and, to the extent any court found probable cause, it was based upon false statements and material omissions that vitiated probable cause if exposed.

145. Defendant Microsoft acted at all times intentionally and maliciously.

146. Defendant Microsoft acted at all times under color of state law because it acted in concerted and joint effort with SA Decker and the FBI as hereinabove alleged.

147. Defendant Microsoft is equitably estopped from asserting the statute of limitations as a defense with regard to the federal criminal investigation because it made material false representations that Plaintiffs relied upon, in that Microsoft alleged and stated that Plaintiffs' actions violated its copyright.

148. As a direct and proximate result of Defendant Microsoft's malicious prosecution, Plaintiffs suffered economic and non-economic damages in excess of $75,000.00.

149. Defendant Microsoft acted intentionally, maliciously, or in reckless disregard for Plaintiffs' Craig PC and Craig, II's rights, all in a money-making scheme, and Plaintiffs are entitled to punitive and exemplary damages.

WHEREFORE, Plaintiffs Craig PC Sales & Service, LLC and Ray T. Craig, II, pray for judgment against Defendant Microsoft Corporation as follows:

(1)     For economic and noneconomic damages in excess of Seventy-Five Thousand Dollars and No/100 ($75,000.00);

(2)     For punitive and exemplary damages;

(3)     For interest thereon as provided by law, both pre-judgment and post-judgment;

(4)     For their costs and a reasonable attorneys' fee; and

(5)     For such other and further relief as the Court deems just, equitable, and proper.

**PLAINTIFFS CRAIG PC, CRAIG, SR., AND CRAIG, II'S SIXTH CAUSE OF ACTION AGAINST MICROSOFT – INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS AND PROSPECTIVE ECONOMIC <u>ADVANTAGE</u>**

150.    Plaintiffs incorporate by reference paragraphs 1-149 as though set forth in full herein.

151.    Plaintiffs had a valid business relationship and expectancy with various school districts and private clients.

152.    Defendant Microsoft had knowledge of Plaintiffs' valid business relationship and expectancy with these school districts and private clients.

153.    Defendant Microsoft intentionally interfered with Plaintiffs' valid business relationship and expectancy by making the false statements that Plaintiffs' violated Microsoft's copyright in 2014 and 2015.

154.    Defendant Microsoft acted intentionally, willfully, and maliciously, and its interference was not justified or privileged.

155.    As a direct and proximate result of Defendant Microsoft's intentional interference, Plaintiffs suffered economic and non-economic damages in excess of $75,000.00.

156.    Defendant Microsoft acted intentionally, maliciously, or in reckless disregard for Plaintiffs' rights, all in a money-making scheme, and Plaintiffs are entitled to punitive and exemplary damages.

157.    This claim relates back to Plaintiffs' filing dated February 25, 2016 against Defendant Microsoft in the District Court of Grady County, Case No. CJ-16-49.

WHEREFORE, Plaintiffs Craig PC Sales & Service, LLC, Ray T. Craig, Sr., and Ray T. Craig, II, pray for judgment against Defendant Microsoft Corporation as follows:

(1)    For economic and noneconomic damages in excess of Seventy-Five Thousand Dollars and No/100 ($75,000.00);

(2)    For punitive and exemplary damages;

(3)    For interest thereon as provided by law, both pre-judgment and post-judgment;

(4)    For their costs and a reasonable attorneys' fee; and

(5)    For such other and further relief as the Court deems just, equitable, and proper.

Respectfully submitted,

/s/ Barrett T. Bowers
Stanley M. Ward, OBA#9351
Woodrow K. Glass, OBA#15690
Barrett T. Bowers, OBA#30493
Geoffrey A. Tabor, OBA#32880
WARD & GLASS, L.L.P.
1601 N.W. 36th Avenue, Suite 100
Norman, Oklahoma 73072
barrett@wardglasslaw.com
405-360-9700
405-360-7902 (fax)

-and-

Bret Burns
Burns Law Office
519 W. Chickasha Avenue
Chickasha, OK  73018
**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

I hereby certify that on the 24th day of April, 2017, I electronically transmitted the attached document to the Clerk of the Court using the ECF System for filing.  Based on the records currently on file, the Clerk of the Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Ronald T. Shinn, Jr.
McAfee & Taft
10th Floor, Two Leadership Square
211 N. Robinson
Oklahoma City, OK  73102

-and-

William S. Leach
McAfee & Taft
Williams Center Tower II
Two West Second Street, Suite 1100
Tulsa, OK  74103
**ATTORNEYS FOR DEFENDANT**

/s/ Barrett T. Bowers